UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------X

ZANATHIOUS HORN,

               Plaintiff,

      -against-

COMMISSIONER OF SOCIAL SECURITY,

              Defendant.

-----------------------------------------------------------------------X

D / F

**MEMORANDUM & ORDER**

**13-CV-1218 (NGG)**

NICHOLAS G. GARAUFIS, United States District Judge.

Plaintiff Zanathious Horn brings this action, pursuant to 42 U.S.C. § 405(g), seeking

judicial review of the Social Security Administration's (the "SSA") decision that he is not

disabled and therefore does not qualify for Social Security Disability Insurance Benefits

("DIB"). Plaintiff argues that (1) the case should be remanded in light of certain new evidence,

and (2) the ALJ did not follow the proper legal analysis in assessing the credibility of Plaintiff's

statements regarding his symptoms. Both Plaintiff and Defendant, the Commissioner of Social

Security, have filed motions for judgment on the pleadings pursuant to Federal Rule of Civil

Procedure 12(c). (Def.'s Not. of Mot. (Dkt. 23); Pl.'s Not. of Mot. (Dkt. 25).) For the reasons

set forth below, the Commissioner's motion is DENIED, Plaintiff's cross-motion is GRANTED

IN PART, and this case is REMANDED to the SSA for further proceedings.

**I.     BACKGROUND**

Plaintiff was born on October 25, 1962. (See Administrative R. ("R.") (Dkt. 9) at 17.)

He has at least a high school education. (Id.) He last worked as a chef with Morrison's Health

Care ("Morrison's"), cooking for physicians at a hospital from January 2007 to May 2010. (Id.

at 153, 166.) This position involved planning the menu, cooking the food, and setting up the

dining room. (Id. at 32.) In this capacity, Plaintiff stood or walked throughout the day and

1

frequently handled large objects weighing over fifty pounds. (Id. at 154, 167.) From 2000 to 2007 Plaintiff worked in various food service positions and as a day laborer; each position required him to stand and walk throughout the day and to lift heavy objects weighing over fifty pounds. (Id. at 166, 168-72.)

In a Work History Report dated August 7, 2010, Plaintiff wrote that after years of working, he was experiencing pain in his knees and fingers related to arthritis, and that his mental state was deteriorating as he grew older. (Id. at 173.) Plaintiff further indicated that he had difficulty getting out of bed and could not keep a job for long periods of time. (Id.) In May 2010, Plaintiff was terminated from his job with Morrison's for lack of performance, and went on to collect unemployment until April 2012. (Id. at 31-32, 152, 222.) During that time, he was also attending college and working toward an associate's degree in event planning. (Id. at 30-31.) At a hearing before the SSA, Plaintiff testified that one of the main reasons he stopped working at Morrison's was because of swelling in his hands and pain in his left leg. (Id. at 45.)

In an August 2, 2010, Disability Report, Plaintiff claimed that he was disabled due to bipolar disorder, manic depression, bronchitis, and "left leg." (Id. at 151-52.) He reported that as a result of these conditions, he stopped working on May 15, 2010. (Id. at 152-53.) Plaintiff listed Albuterol for the treatment of asthma as the only medication he was taking at the time. (Id. at 154.)

## A.     Medical Evidence

In reviewing Plaintiff's proffered medical evidence, the court separately discusses: (1) evidence of Plaintiff's condition before his alleged disability onset date of May 15, 2010; (2) evidence of Plaintiff's condition between May 15, 2010, and the date of his hearing before the SSA on October 4, 2011; and (3) evidence of Plaintiff's condition after October 4, 2011.

2

1.    Prior to Plaintiff's Alleged Onset Date

On July 2, 2002, Plaintiff underwent a procedure to repair the Achilles tendon in his left ankle at the University of South Alabama Medical Center ("USAMC"). (See id. at 230-35.) In the Operative Report, Dr. Frederick Meyer noted that the procedure was successful and that Plaintiff was in satisfactory condition. (Id. at 233.)

On October 5, 2002, Plaintiff was admitted to the USAMC emergency room following a drug overdose. (Id. at 237-38.) Plaintiff was stabilized and then transferred to the Mobile Infirmary Medical Center psychiatric unit. (Id. at 237.) Plaintiff reported that he was taking Tylenol #3 for jaw pain and "partying" by consuming alcohol and using cocaine. (Id.) Plaintiff's mother had died eight weeks earlier. (Id.) On the night of the incident, Plaintiff had consumed his "normal level" of cocaine and alcohol in addition to the Tylenol for jaw pain. (Id. at 241.) He was later discovered by his next door neighbor to be somewhat obtunded, and was subsequently taken to USAMC. (Id.) Plaintiff reported that he had struggled with depressive symptoms over several years, with a gradual increase in recent months. (Id.) Plaintiff further disclosed that he had taken Prozac and Zoloft in the past, but that he discontinued their use due to the side effects of impotence and gastrointestinal disease. (Id. at 241-42.) Plaintiff admitted to recurring alcohol and cocaine abuse, and reported that he had never attended rehabilitation. (Id. at 241.) While it was originally thought that Plaintiff's overdose represented a suicide attempt, Plaintiff explained the following day that it was an accident. (Id. at 242.)

A mental status exam revealed Plaintiff to be alert, oriented, and cooperative despite being acutely disheveled. (Id. at 243.) Plaintiff's thought process was linear without looseness of association or flight of ideas. (Id.) His mood was depressed, and Plaintiff denied any hallucinations. (Id.) On Axis I, Plaintiff was diagnosed with major depression, recurrent, moderate, as well as cocaine abuse. (Id.) On Axis V, Plaintiff's Global Assessment of

3

Functioning ("GAF") was 45. (Id. at 244.) Plaintiff was prescribed Remeron. (Id.) Upon discharge, Plaintiff's GAF was 65. (Id. at 239.) Following discharge, Plaintiff was to follow up with the Mobile Mental Health Center ("MMHC") and a psychologist. (Id.)

In April 2005, Plaintiff began receiving mental health treatment at MMHC, now affiliated with AltaPointe Health Systems, Inc. ("AltaPointe"). (See id. at 248-53.) Plaintiff was admitted on April 4, 2005, when his Axis I diagnosis was bipolar I disorder, with the most recent episode mixed, severe. (Id. at 252.) Plaintiff's GAF was recorded as 55. (Id.) On May 25, 2005, Plaintiff was discharged from treatment due to lack of contact. (Id. at 249.)

On September 12, 2005, Plaintiff was treated at USAMC in connection with an upper respiratory infection. (Id. at 254-56.)

Plaintiff was seen for reassessment at AltaPointe on April 3, 2006, when he reported experiencing difficulty getting out of bed and functioning. (Id. at 250.) Plaintiff further stated that he was encountering difficulty at work and experiencing suicidal ideation due to stress. (Id.) After this visit, Plaintiff was to continue treatment for depressive symptoms. (See id.) On December 6, 2006, however, Plaintiff was discharged and his chart was closed because he had not been seen in 90 days, and was not consistently compliant with treatment. (Id. at 248.) Beth Blair, a clinician with AltaPointe, recommended substance abuse treatment for alcohol dependence and other drug use. (Id.)

On June 10, 2008, Plaintiff was treated at USAMC for left-sided abdominal pain that persisted for one month, with recent nausea and vomiting. (Id. at 257-59.) Plaintiff also complained of having dark stools for two weeks and difficulty urinating for two to three months. (Id. at 257.) Plaintiff's outpatient record indicated that he was a heavy drinker. (Id.) Plaintiff was prescribed Ranitidine and Promethazine. (Id. at 259.) Plaintiff was further advised to seek

4

help for his drinking at Alcoholics Anonymous, and to follow up with a physician in two to three days to have his stool rechecked for blood. (Id.)

On January 30, 2009, Plaintiff was evaluated by Jonathan Miller, M.D., at Diagnostic and Medical Care. (Id. at 266.) Plaintiff explained his concern that he had been smoking since 1976 and had developed a chronic cough. (Id.) Dr. Miller noted that Plaintiff appeared "stable and doing well." (Id.) Dr. Miller noted a history of tobacco use and asthma. (Id.) Plaintiff followed up with Dr. Miller on April 20, 2009. (Id. at 264). Dr. Miller noted that chest x-rays displayed some emphysematous changes, but Plaintiff's lungs were clear. (Id.) Upon Plaintiff's request, he was prescribed Antabuse for alcohol use. (Id.) Plaintiff was treated by Dr. Miller again on May 6, 2009, to follow up and address complaints of some sinusitis symptoms. (Id. at 262.) Dr. Miller treated him for sinusitis, and noted that Plaintiff was doing much better with his alcohol use after extensive counseling. (Id.)

2. After May 15, 2010

On September 9, 2010, Plaintiff was evaluated by Keith Varden, M.D., of Diagnostic and Medical Care. (Id. at 275-76.) Plaintiff's chief complaint was disability described as secondary to bipolar disorder. (Id. at 275.) Plaintiff also complained of knee pain, osteoarthritis and pain in the hands, and mild asthma. (Id.) Dr. Varden diagnosed Plaintiff with a history of bipolar disorder, osteoarthritis and althralgias and mild asthma. (Id. at 275-76.) Dr. Varden further observed that pending psychiatric evaluation, there was no evidence for permanent disability related to these conditions. (Id. at 275.)

On September 23, 2010, in connection with Plaintiff's application for disability insurance benefits, his case was evaluated by E. Russell March, Jr., M.D. (Id. at 277.) Based on the medical evidence and the presentation of the Plaintiff, Dr. March concluded that Plaintiff's impairments were not severe. (Id.)

5

Also in connection with Plaintiff's application, on September 23, 2010, John W. Davis, Ph.D., conducted a consultative psychiatric examination of Plaintiff. (See id. at 281-85.) Dr. Davis observed that Plaintiff's general appearance, dress, and behavior were consistent with his age and the occasion, and that there was nothing unusual about his gait, posture, mannerisms, or hygiene. (Id. at 281.) Dr. Davis further noted that Plaintiff demonstrated a "good degree" of self-sufficiency in his bathing, dressing, and feeding. (Id.) Plaintiff explained that he had difficulty focusing, which alongside his temper and lack of desire to leave the house, prevented him from holding a job. (Id.) Dr. Davis observed that Plaintiff demonstrated no abnormalities interfering with communication. (Id. at 282.) Plaintiff also reflected normal mood and expression. (Id.) Dr. Davis further observed that Plaintiff provided no indications of deficits in his overall concentration or attention. (Id. at 283.) Plaintiff exhibited no loose associations, tangential, or circumstantial thinking. (Id. at 284.) Further, Plaintiff displayed no feelings of detachment from his environment. (Id.) Dr. Davis found Plaintiff's judgments and insights to be fair, and estimated that Plaintiff was of average intelligence. (Id.)

As a result of this evaluation, Dr. Davis diagnosed major depressive disorder. (Id.) Dr. Davis opined that Plaintiff manifested depressive symptoms such as loss of interest in activities, sleep disorder, decreased energy, feelings of guilt or worthlessness, and difficulty concentrating or thinking. (Id.) Dr. Davis found that Plaintiff's ability to understand and remember simple instructions, carry out simple instructions, and make judgments on simple work-related decisions was mildly impaired. (Id. at 285.) Dr. Davis further observed that Plaintiff's ability to understand and remember complex instructions, carry out complex instructions, and make judgments on complex work-related decisions was also mildly impaired. (Id.) Finally, Dr. Davis determined that Plaintiff's abilities to interact with the public, interact appropriately with

6

supervisors and co-workers, respond appropriately to usual work situations and changes in routine setting, were moderately impaired. (Id.)

In further connection with Plaintiff's application, on October 12, 2010, Linda Duke, Ph.D., reviewed his record and completed a Psychiatric Review Technique. (Id. at 286-99.) Dr. Duke determined that Plaintiff's major depressive disorder did not meet the criteria of section 12.04 of the Listing of Impairments for affective disorders, see 20 C.F.R. § 404 Subpart P, App. 1. (Id. at 289.) In rating Plaintiff's functional limitations with respect to the criteria in paragraph B of section 12.04, Dr. Duke found that Plaintiff had mild restrictions with respect to activities of daily living, and moderate restrictions with respect to maintaining social functioning and maintaining concentration, persistence, or pace. (Id. at 296.) Dr. Duke found that Plaintiff had no episodes of decompensation. (Id.)

Dr. Duke also appraised Plaintiff's mental residual functional capacity ("RFC"). (Id. at 300-02.) Dr. Duke found that Plaintiff was not significantly limited in either his ability to remember locations and work-like procedures, or his ability to understand and remember very short and simple instructions. (Id. at 300.) Plaintiff was moderately limited, however, in his ability to understand and remember detailed instructions. (Id.) With respect to sustained concentration and persistence, Plaintiff was not significantly limited in his abilities to: carry out very short and simple instructions; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being distracted by them; and complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Id. at 300-01.) Within the same category, Plaintiff was moderately limited in

his abilities to carry out detailed instructions, and maintain attention and concentration for an extended period. (Id. at 300.)

As to social interaction, Dr. Duke concluded that Plaintiff was not significantly limited in his abilities to: ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. (Id. at 301.) Plaintiff was moderately limited in his ability to interact appropriately with the general public. (Id.) Plaintiff was not significantly limited in any aspect of adaptation. (Id.) Overall, Dr. Duke concluded that Plaintiff had the RFC to remember, understand, and carry out short, simple, one and two-step job instructions, and to attend and concentrate for reasonable increments of time. (Id. at 302.) Additionally, Dr. Duke determined that Plaintiff's contact with the public should be limited and casual in nature. (Id.)

In October 2010, Plaintiff sought treatment at AltaPointe. (See id. at 326-32.) Plaintiff's diagnosis was Axis I: major depressive disorder, recurrent, mild; alcohol abuse, continuous; cocaine abuse, episodic. (Id. at 322.) Plaintiff's Axis II diagnosis was narcissistic personality disorder. (Id.) Plaintiff's GAF rating at the time was 60. (Id.) On October 28, 2010, an outpatient treatment plan was initiated for Plaintiff, with the goals of Plaintiff receiving disability, staying sober, increasing his social support system, and improving his anger management. (Id. at 323-24.) Plaintiff was instructed to see a physician every three months for assessment and treatment, and a nurse every three months for medication monitoring. (Id. at 324.)

On November 4, 2010, however, Plaintiff missed his appointment with Kristin Stiggers, a behavioral specialist at the facility. (Id. at 321.) Four days later, on November 8, 2010, Plaintiff

appeared at the USAMC emergency room complaining of right shoulder and arm pain, and bilateral knee pain. (See id. at 304-10.) Plaintiff explained that the pain had started a year earlier. (Id. at 304.) Plaintiff further advised that he had noticed a decreased appetite and increased depression. (Id.) Plaintiff also complained of a mass in his right upper arm, and a decrease in strength in his right leg. (Id.) Examination revealed decreased strength in his right leg with otherwise normal range of motion and strength. (Id. at 305.) Evaluation also demonstrated that Plaintiff had bilateral deformities of his fingers. (Id.) Plaintiff was found to be alert and oriented. (Id.) Plaintiff was ultimately diagnosed with shoulder pain and prescribed Naproxen. (Id. at 305-06.)

Plaintiff missed another appointment at AltaPointe on November 11, 2010. (Id. at 319.) Plaintiff subsequently rescheduled his November 23, 2010, appointment, and was advised that if he missed another appointment, his chart would be closed. (Id. at 316.)

On December 3, 2010, Plaintiff appeared at AltaPointe for an appointment with Farah Khan, M.D. (See id. at 311-15.) Plaintiff informed Dr. Khan that he was experiencing stomach aches, nervousness, chills and fever, and sleeplessness. (Id. at 312.) Plaintiff told Dr. Khan that he was enrolled in four college courses, working towards a degree in food service at Faulkner State College. (Id. at 312, 315.) Plaintiff reported that he failed one course, and received two D's and one A in the others. (Id. at 312, 315.) Upon psychiatric evaluation, Dr. Khan found that Plaintiff's behavior was cooperative, and that his mood was normal. (Id. at 313.) Plaintiff reported no suicidal or homicidal thoughts, and had no abnormal perceptions. (Id.) Dr. Khan further indicated that Plaintiff's memory was unimpaired and that his thoughts were logical and coherent. (Id.) Dr. Khan found no impairment of concentration, and determined that Plaintiff's insight and judgment were fair. (Id.) Plaintiff disclosed that he had been using alcohol at the

9

time, but had not used drugs in two months. (Id. at 314.) On Axis I, Dr. Khan diagnosed major depressive disorder, recurrent, mild; intermittent explosive disorder; and cocaine and alcohol abuse, continuous. (Id.) On Axis II, Dr. Khan diagnosed narcissistic personality disorder, and on Axis III, Dr. Khan diagnosed arthritis. (Id.)

Additionally, Dr. Khan observed that Plaintiff appeared angry upon being informed that his drug and alcohol use could pose a problem for his disability application. (Id. at 315.) When prompted with questions about how he would feel about regular drug testing and abstaining from cocaine and alcohol, Plaintiff insisted that his substance use was "not a problem." (Id.) Dr. Khan also noted that Plaintiff seemed to contradict himself in response to his question about how Plaintiff was able to be around people in food service, saying, "I can still turn it off and on when I want to." (Id.) Dr. Khan prescribed Remeron. (Id.)

On December 6, 2010, Plaintiff appeared again at AltaPointe because he was unable to obtain Remeron elsewhere. (Id. at 348.) Plaintiff informed staff member Evelyn Harbaugh, R.N., that he was doing better since his last visit, but that he was still having difficulty sleeping. (Id. at 348.) Harbaugh observed Plaintiff's behavior to be normal and cooperative. (Id.) Plaintiff reported that he sometimes used alcohol when taking Loratab, and that he had used cocaine about a week earlier, having failed to discover it in a cigarette. (Id.) Plaintiff also disclosed that he occasionally experienced auditory hallucinations, believing someone was calling his name. (Id. at 349.) Plaintiff also experienced feelings of someone being in the room with him. (Id.) His judgment and insight were poor, and his concentration was impaired. (Id.) Plaintiff further reported having moderate anxiety. (Id.)

The same day, Plaintiff was seen by Magdi Tageldin, M.D., who found that he exhibited normal behavior and was cooperative. (Id. at 350-51.) While Plaintiff displayed a sad mood and

10

a sad, blunted affect, Plaintiff did not report having any suicidal or homicidal thoughts. (Id. at 350.) He again reported, however, having auditory hallucinations and thoughts of persecution. (Id. at 351.) But his memory and concentration did not appear impaired, and his insight and judgment appeared fair. (Id.) Dr. Tageldin found Plaintiff to have mild anxiety. (Id.) Dr. Tageldin outlined a treatment plan, which included Plaintiff attending Alcoholics Anonymous meetings, a twelve-step program, and support psychotherapy. (Id. at 350.) Dr. Tageldin prescribed Wellbutrin, Depakote, and folic acid and thiamine replacement. (Id.) Plaintiff was instructed to return in two weeks for follow-up. (Id.)

On December 21, 2010, Plaintiff returned to AltaPointe for a medication monitoring appointment. (Id. at 344.) He was initially seen by Teresa Lanier, R.N. (Id. at 344.) Plaintiff informed Lanier that he had not started Wellbutrin because he did not provide proof of income to the pharmacy. (Id. at 344.) Lanier noted that Plaintiff was compliant with the other medications. (Id.) Plaintiff reported that his mood was much calmer and denied feeling depressed. (Id.) Plaintiff further informed Lanier that he had not had any anger outbursts, and was sleeping much better. (Id.) Plaintiff's behavior was normal and cooperative, and his mood was normal with a situationally appropriate affect. (Id.) His appetite and sleep were good, and he did not have any speech impairments. (Id.) He denied any self-injurious behavior, suicidal, or homicidal thoughts. (Id.) Plaintiff's memory and concentration were unimpaired (id. at 344-45), and his insight and judgment appeared good (id. at 345), but Plaintiff displayed mild anxiety. (Id.)

Plaintiff was seen again by Dr. Tageldin the same day. (See id. at 346-47.) Plaintiff informed Dr. Tageldin that he was doing better and had been sleeping well. (Id. at 346.) He reported no overt mood symptoms or psychosis. (Id.) Plaintiff discussed his legal issues stemming from his mother's property in New York. (Id.) Plaintiff further informed Dr. Tageldin

11

that he had a pending court date for public intoxication, and reported that he felt busy. (Id.)
Plaintiff denied that he had used alcohol or cocaine recently. (Id.) Plaintiff's behavior and mood
were normal. (Id.) His appearance and affect were appropriate. (Id.) Plaintiff reported no
suicidal or homicidal thoughts. (Id.) Plaintiff's memory and concentration appeared
unimpaired. (Id. at 347.) His thoughts and perceptions were within the normal range. (Id.)
Plaintiff's insight and judgment were deemed fair. (Id.) No anxiety was noted. (Id.)

Although Plaintiff was scheduled to return six weeks later (id. at 346), he failed to appear
for two consecutive appointments on February 2 and 3, 2011, and missed a third rescheduled
appointment on April 12, 2011, because he did not have the co-pay (id. at 342-43). On
April 25, 2011, however, Plaintiff returned to AltaPointe, and was treated by Terri Mudge,
L.P.C. (See id. at 336-37.) He informed Mudge that since November 2010, he had been arrested
three times for violent behavior. (Id. at 336.) Plaintiff also stated that he had stopped using
drugs but still drank alcohol on occasion. (Id.) Plaintiff further indicated that he was becoming
frustrated trying to manage the estate of his late mother, to get on disability, and to deal with the
physical pain he experienced in his knee and ankle. (Id.) Plaintiff also seemed frustrated by the
fact that it was against AltaPointe's policy to complete paperwork in connection with his
upcoming disability hearing. (Id.)

Upon mental status examination, Plaintiff was found to be cooperative with normal but
hyperactive behavior. (Id.) Mudge noted that Plaintiff appeared irritable and angry. (Id.)
Plaintiff's affect was sad and blunted. (Id.) Plaintiff had poor appetite and sleep. (Id.) He once
again reported auditory hallucinations of people calling his name, and reported further
hallucinations of a visual nature. (Id.) Plaintiff also informed Mudge that he was paranoid often,
and believed that people might hurt him. (Id. at 337.) Plaintiff's memory and concentration

were impaired. (Id.) Mudge further noted that Plaintiff was experiencing racing thoughts, obsession, and thoughts of persecution. (Id.) Plaintiff's anxiety was noted as moderate. (Id.)

That same day, Plaintiff also met with Tameka Jackson, R.N. (See id. at 338-39.) Plaintiff reported experiencing difficulty sleeping and increased depression due to his financial problems. (Id. at 338.) He asked that his Remeron dosage be increased. (Id.) Plaintiff denied using drugs or alcohol. (Id.) Plaintiff's behavior appeared normal and cooperative. (Id.) His mood was sad; his affect was appropriate to the situation. (Id.) Plaintiff displayed logical and coherent thoughts, and no impairment in concentration. (Id. at 338-39.) Plaintiff also denied having any suicidal or homicidal thoughts. (Id. at 338.) Plaintiff's insight and judgment were good. (Id. at 339.) No anxiety was noted. (Id.)

Finally, Plaintiff also met with Diaa Noaman, M.D. (See id. at 340-41.) Plaintiff reported that he was experiencing financial problems and looking for a job, both of which were causing him sadness. (Id. at 340.) Plaintiff denied experiencing any manic or psychotic symptoms. (Id.) Dr. Noaman noted that Plaintiff's behavior was normal and cooperative. (Id.) Plaintiff's mood and affect were sad. (Id.) Plaintiff's appetite was good and his sleep was fair. (Id.) Plaintiff denied any suicidal or homicidal thoughts. (Id.) His thoughts appeared logical and coherent with no impairment in concentration or memory. (Id. at 341.) He displayed fair insight and good judgment. (Id.) No anxiety was noted. (Id.) Dr. Noaman's treatment plan continued Plaintiff on Depakote, Vistaril, Wellbutrin, and Remeron at an increased dosage. (Id. at 340.)

On July 8, 2011, Plaintiff was evaluated by Mark A. Pita, M.D.,[1] with the Mobile County Health Department. (See id. at 353-58.) Plaintiff complained of arthritis in his left ankle, foot,

---

[1] The ALJ referred to this physician as Dr. Mosha Peters. (See, e.g., R. at 16, 17.) This appears to be a result of error introduced by Plaintiff's counsel in the proceedings below. (See id. at 29 ("[I] probably mislabeled the name

knee, shoulder, and hand. (Id. at 355.) He also reported a history of bipolar disorder. (Id.) Plaintiff further informed Dr. Pita that he was applying to the SSA for Supplemental Security Income ("SSI"), and needed a primary care physician. (Id.) Plaintiff claimed that the pain he experienced from rheumatoid arthritis had recently worsened, and was interfering with his activity and sleep. (Id.) Plaintiff stated that the pain was throbbing and persistent. (Id.) Upon evaluation, Dr. Pita noted that while Plaintiff had pain localized to one or more joints, he was not feeling tired or poorly, and did not have depression. (Id. at 356.) Plaintiff's lungs exhibited normal respiration, depth, and rhythm. (Id. at 357.) Dr. Pita diagnosed Plaintiff with swan-neck deformities in both hands. (Id.) Upon neurological examination, Plaintiff exhibited no dysfunction in his motor capabilities. (Id.) Dr. Pita's assessment was arthropathy, rheumatoid arthritis, bipolar disorder, and primary insomnia. (Id.) Dr. Pita prescribed Mobic, Ultram, Prednisone, Ambien, and Albuterol. (Id. at 357-58.)

On July 11, 2011, Plaintiff returned for blood and urine testing. (See id. at 359-68.) On August 3, 2011, Plaintiff returned for a follow-up with Dr. Pita. (Id. at 374-75.) The laboratory results showed hypertriglyceridemia, but Plaintiff stated that he had eaten prior to the exam. (Id. at 374.) Plaintiff reported that his insomnia was slightly improved and that his pain had mildly improved with the medications. (Id.) Upon examination, Plaintiff's respiration rhythm and depth were normal. (Id. at 375.) Plaintiff's musculoskeletal system also appeared normal. (Id.) Upon neurological examination, Plaintiff's cranial nerves and motor skills were normal. (Id.)

---

on the CD. But it's marked Peta [sic], and we were told Mosh[e] Peters, so I think that's our error . . . ." (alterations added)).) This error may have been introduced through material added by counsel to label the underlying documents. (See, e.g., id. at 369.) As the underlying records themselves indicate, this physician's name—as it appears in print—is Mark A. Pita. (See, e.g., id. at 374, 375.) Thus, the court need not rely on the physician's signatures, which are nonetheless consistent with the name Mark Pita (see, e.g., id. at 370, 372), to establish this fact (although the ALJ appeared to do so (see id. at 29)).

Dr. Pita's diagnosis was asthma, arthropathy, and primary insomnia. (Id.) Plaintiff was to use Albuterol, ProAir, and Elavil. (Id.)

Dr. Pita also completed a physical capacities evaluation of Plaintiff on August 3, 2011. (Id. at 370.) Dr. Pita indicated that Plaintiff could sit for one hour at a time, for a total of two hours in an eight-hour workday. (Id.) Dr. Pita further indicated that Plaintiff could stand and walk for less than one hour at a time, for a total of two hours each in an eight-hour workday. (Id.) Plaintiff could lift up to ten pounds frequently, and up to twenty pounds occasionally. (Id.) Plaintiff could not lift anything over twenty pounds. (Id.) Dr. Pita found that Plaintiff was unable to use either hand for simple grasping, pushing and pulling of arm controls, or fine manipulation. (Id.) Dr. Pita noted that Plaintiff was unable to use either foot for repetitive movements. (Id.) Plaintiff was not able to bend, squat, crawl, climb, or reach. (Id.) Dr. Pita indicated that Plaintiff was totally restricted with respect to unprotected heights and being around moving machinery. (Id.) Plaintiff was mildly restricted from exposure to marked changes in temperature and humidity. (Id.) Plaintiff was moderately restricted in his ability to drive automotive equipment. (Id.) Plaintiff was also mildly restricted with respect to exposure to dust, fumes, and gases. (Id.)

Finally, Dr. Pita completed a clinical assessment of Plaintiff's pain that same day. (See id. at 371-72.) Dr. Pita found that Plaintiff experienced pain to such an extent as to be distracting to the adequate performance of daily activities or work. (Id. at 371.) It was also Dr. Pita's view that physical activity such as walking or standing would greatly increase Plaintiff's pain to such a degree that it would cause distraction from or total abandonment of his task. (Id.) Dr. Pita further indicated that medication side effects might be present, but not to such a degree as to

15

create serious problems in most instances. (Id. at 372.) Dr. Pita ultimately concluded that Plaintiff's underlying medical condition was consistent with the pain he experienced. (Id.)

               3.     Post-Hearing Medical Evidence in Administrative Record

In reviewing the denial of Plaintiff's disability claim, the Social Security Appeals Council also considered—in addition to the foregoing evidence—what it labeled "Medical records from the University of South Alabama Hospitals for the time period of November 14, 2010 to May 24, 2012." (Id. at 5.) This evidence was not part of the record when an administrative law judge ("ALJ") initially found that Plaintiff was not disabled, but was added to the administrative record as Exhibit B19F by the Appeals Council. (Id.)

These records included invoices for services, as well as lists of doctor and hospital visits during the time period after the ALJ conducted a hearing, see infra Part I.B. (See, e.g., id. at 381-86, 388, 392, 398.) Also contained in these records were a letter, dated May 2, 2012, from the Alabama Department of Human Resources approving Plaintiff for food stamps, and a letter, dated September 30, 2011, approving Plaintiff for ADA Paratransit (M.A.P.) transportation services. (See id. at 383, 403.)

In addition, these records included a printout from the Ozanam Charitable Pharmacy, which lists the following medications as having been prescribed to Plaintiff between January 1, 2010 and February 29, 2012: Naproxen, Hydroxyzine, Cetirizine HCL (Zyrtec), folic acid, Vitamin B-1, Divalproex Sodium (Depakote), Mirtazapine (Remeron), Bupropion (Wellbutrin), Meloxicam (Mobic), Tramadol HCL (Ultram), Prednisone, Amitriptyline HCL (Elavil), Simvastin (Zocor), Cyclobenzaprine (Flexeril), and Omeprazole (Prilosec). (See id. at 395-97.)

Further included in this exhibit was a duplicate copy Plaintiff's Physical Capacities Evaluation completed by Dr. Pita on August 3, 2011. (Id. at 402.) The exhibit also included

records reflecting that on October 24, 2011, Dr. Pita indicated Plaintiff was taking Ambien, Elavil, Mobic, ProAir, Simvastin, Ultram, and Viagra. (Id. at 387.) They further reflect that on April 2, 2012, Dr. Pita generated a report documenting that Plaintiff had been diagnosed with bipolar disorder, unspecified, as of July 8, 2011, and pure hypercholesterolemia, as of September 28, 2011. (Id. at 394.) The records also show that on April 2, 2012, Plaintiff was again prescribed Elavil and Viagra, and was provided with a wrist splint for managing carpal tunnel. (See id. at 389.)

Another set of records indicate that on May 13, 2012, Plaintiff was admitted to USAMC. (Id. at 407.) On May 22, 2012, by which point Plaintiff indicated persistent pneumothorax on the right side, Carl Maltese, M.D., performed a diagnostic bronchoscopy and surgical thoracoscopy, removing bullous emphysema. (Id. at 408-09.) Plaintiff was not discharged until May 25, 2012. (Id. at 407.)

Finally, a report generated on June 6, 2012, reflected that Plaintiff had been diagnosed with a cough and constipation. (Id. at 389.) At that point, he was continuing his ProAir and Ultram prescriptions from 2011. (Id.) The report also reflected that on April 2, 2012, Plaintiff had been again prescribed Elavil and Viagra; and on June 6, 2012, he was also prescribed Albuterol, Lortab, and Miralax. (Id. at 389-90.)

**B.      Other Evidence**

1.      Plaintiff's Testimony

On October 4, 2011, Plaintiff testified at a hearing regarding his disability claim before D. Burgess Stalley, ALJ with the SSA. (See id. at 26, 30-48.) Plaintiff testified that he had been evicted from his prior address in May 2011, and had been staying at relatives' houses since then. (Id.) He had taken the bus to the hearing. (Id. at 30.) Having recently transferred from Faulkner State to Virginia College, he was still working toward his associate's degree in event planning,

and expected to graduate the following summer. (Id. at 30-31.) Plaintiff testified that his grades were B's, C's, and two D's. (Id. at 37.) Plaintiff reported that he needed to attain a C or better in order to continue receiving his grants to attend college. (Id. at 31-32, 37.) Plaintiff was also receiving unemployment benefits. (Id. at 31-32.) In his testimony, Plaintiff acknowledged that in order to receive the unemployment benefits, he had to swear that he would be ready and willing to go to work if he received a job. (Id. at 32.) Plaintiff testified that he had been fired from his last job as a chef due to his lack of performance. (Id.) Plaintiff had been the sole chef for 86 doctors at a hospital but could not fulfill his duties as a result of his arthritis. (Id.) Plaintiff had worked at the hospital five days per week for two and a half years, having worked his way up from pot washer to chef. (Id. at 33-34.)

Plaintiff testified that while he sometimes used drugs and alcohol while he was working there, by the time of the hearing, he had not used drugs or alcohol for one year. (Id. at 34.) The ALJ pointed out, however, that records dated December 3, 2010, reflected Plaintiff's involvement in a domestic violence incident in which he stated that he needed to stop drinking and using drugs. (Id. at 34.) Plaintiff responded that this incident took place around the time of his birthday, and admitted that he had been consuming alcohol and using cocaine at the time. (Id. at 35.) Plaintiff explained that he had received the drugs from friends. (Id. at 36.) Nonetheless, Plaintiff further stated that he was no longer consuming alcohol. (Id. at 37-38.) At the time of the hearing, Plaintiff was performing community service to serve his sentence pursuant to a public intoxication charge. (Id. at 39.) Plaintiff also had a lawsuit pending in civil court in Mobile, Alabama in connection with settling his mother's estate. (Id. at 41.)

When asked about his missed appointments at AltaPointe and why he had not attended drug rehabilitation as suggested by his doctor, Plaintiff testified that he could not afford the

co-pay. (Id. at 38-39.) Plaintiff also testified that his missed appointments and community service hours were not a result of his drug use, but were instead a consequence of his difficulty getting around. (Id. at 40.) Plaintiff explained that his hands and legs had been bothering him for five years, and that he had taken medication on his own. (Id. at 42.) At the time of the hearing, Plaintiff was using about twelve different medications, which he had obtained through the Catholic Services Clinic. (Id.)

When the ALJ asked why Plaintiff was going to school and working toward a degree and work placement program if he was unable to work, Plaintiff responded that he "needed something to do" and was trying to have "something to fall back on" if "something happened." (Id.) Plaintiff also explained that his depression also prevented him from working; Plaintiff testified that his depression was sometimes so bad as to render him incapable of getting out of bed. (Id. at 43.) Plaintiff stated that he had experienced depression throughout his entire life, and was taking Remeron and Depakote, among other medications, to treat this condition. (Id.) The ALJ also inquired as to Plaintiff's intermittent explosive disorder. (Id. at 43-44.) Plaintiff testified that he was facing charges for assault and battery as a result of an altercation with his stepfather. (Id. at 43-44.)

Plaintiff's attorney also elicited testimony that Plaintiff experienced difficulty grasping and holding heavy objects, and that he was unable to straighten his fingers on both hands. (Id. at 44.) Specifically, Plaintiff had difficulty with his fourth and fifth digits on both hands, which were swollen around the knuckles. (Id. at 45.) Plaintiff also had arthritis and swelling in his left leg and foot. (See id. at 45-46.) Plaintiff testified that he had difficulty standing for long periods of time, lifting heaving objects, and taking notes in class. (Id. at 46.) Plaintiff also testified that the medication he took helped him to sleep for four hours per night, and that he was not hearing

voices as often as before. (Id. at 46-47.) Plaintiff explained that he had been hearing voices for most of his life, but did not hear the voices while he had been taking drugs. (Id. at 47.)

In addition to testifying at the hearing, Plaintiff had also completed a function report, which was dated August 7, 2010. (See id. at 158-65.) Plaintiff indicated that he lived alone in an apartment, and that most of the time it was difficult for him to get out of bed and make something to eat. (Id. at 158.) Plaintiff also had difficulty sleeping. (Id.) Plaintiff reported that he had no problems with personal care, but also indicated that without reminders, he would not shower or cut his hair, and just wanted to sleep. (Id. at 159-60.) While Plaintiff was able to prepare his own meals, his illness caused him to stop cooking "all kinds of meals," and instead, to cook "fast can goods" depending on his level of anger. (Id. at 160.) Plaintiff indicated that he needed encouragement to do household chores such as washing his clothes, and became confused if he tried to do too many chores at once. (Id.) Plaintiff went outside when he felt like it, and alternated between walking and using public transportation. (Id. at 161.) Plaintiff was able to shop in stores for food and household items once a month. (Id.)

Plaintiff reported becoming worse at managing money following the onset of his illness, indicating that compulsive spending had become a problem for him. (Id. at 161-62.) Plaintiff claimed that he had lost interest in his hobbies and did not want to be around other people. (Id. at 162.) Plaintiff also noted that he needed reminders to go places. (Id.) He further emphasized that he had problems getting along with others and did not trust people. (Id. at 163.) He also experienced difficulty getting along with authority figures and work colleagues. (Id. at 164.) Plaintiff indicated that he had difficulty with his memory, concentration, completing tasks, using his hands, and following instructions. (Id. at 163.) Plaintiff noted that he was unable to "keep his mind on one thing for a long period of time." (Id.) But Plaintiff also wrote that he could

20

follow spoken instructions very well, and written instructions when alone. (Id.) Although Plaintiff indicated that he held things inside with regard to stress, he claimed that he handled changes in routine well. (Id. at 164.) Finally, Plaintiff wrote that his depression was getting out of hand and that he wanted help. (Id. at 165.)

### 2. Vocational Expert Testimony

Eric Anderson, an impartial vocational expert, also testified during the October 4, 2011, hearing. The ALJ posed a hypothetical individual of Plaintiff's age, educational and work background, and who could perform only light work. (Id. at 51.) The ALJ further instructed that this hypothetical individual was moderately impaired in his ability to interact appropriately with the public, supervisors, and co-workers, and in his ability to respond to the typical work situations and changes, but could remember, understand, and carry out short and simple two-step instructions, and concentrate for reasonable increments of time. (Id. at 51-52.) Anderson testified that such an individual could not perform Plaintiff's prior job as a chef, but could perform the jobs of garment bagger, assembler, and poultry boner. (Id. at 52-53.) The ALJ then directed Anderson's attention to Exhibit B17F, the Physical Capabilities Evaluation and Clinical Assessment of Pain completed by Dr. Pita on August 3, 2011. (Id. at 53; see also id. at 370-72.) The ALJ asked whether a hypothetical individual with the corresponding vocational profile and pain would be able to perform any work; Anderson testified that such an individual would not. (Id. at 53.)

### 3. Other Evidence Added by the Appeals Council

In making its determination that Plaintiff was not disabled, the Appeals Council also considered newly added Exhibits B15E, B16E, and B17E,[2] which consisted of, in part, Plaintiff's

---

[2] This was in addition to the medical evidence added to the record by the Appeals Council in Exhibit B19F. See supra Part I.A.3.

correspondence with the SSA and educational records from Faulkner State College. Exhibit B15E comprises a series of letters from Plaintiff to the Appeals Council, wherein Plaintiff discussed: his May 2012 hospital stay related to lung problems; how his medical records could be obtained; the increased pain he was experiencing from his rheumatoid arthritis in his legs; his detailed work history, including the physical demands of prior employment; and the impairments to his colon and lungs caused by the medications he was taking. (See id. at 196-215.) In particular, Plaintiff indicated that he suffered an asthma attack that resulted in the collapse of his right lung; that Plaintiff underwent a procedure to remove lobes from his right lung; and that he presently lacked oxygen and breathing treatment because he did not have insurance. (Id. at 201-03, 205.)

Exhibit B16E included a May 1, 2012, letter in which Plaintiff asked the Appeals Council to consider new evidence that he attached, and wrote that his respiratory problems, affective disorder, substance disorder, depression, anxiety, and liver damage had persisted. (Id. at 217.) These attachments included: a list of doctor and hospital visits between November 2011 and May 2012; a March 14, 2012, letter from Bishop State Community College denying Plaintiff financial aid in part due to insufficient qualifying hours, and because the medical documentation he submitted indicated a severe physical limitation that would not permit him to function in commercial food service or masonry; and an April 24, 2012, letter from the Alabama Department of Industrial Relations informing him that no further payments could be made on Plaintiff's extended unemployment benefit claim after the week of April 21, 2012. (Id. at 219-22.) The attached documents also included a May 25, 2011, notice of court action in connection with a lawsuit filed by Manchester Park, LLC against Plaintiff, and an April 19, 2012, letter from the

22

Waterfront Rescue Mission indicating that Plaintiff had spent two nights in its homeless shelter on April 16 and April 19, 2012. (Id. at 223-24.)

Exhibit B17E consists of a Faulkner State College transcript accessed on December 12, 2010, which reflects that Plaintiff received failing grades in nearly all of his classes except one, in which he earned a D. (Id. at 229.)

## II.    PROCEDURAL HISTORY

On August 2, 2010, Plaintiff filed an application for Social Security DIB, claiming that he had been disabled since May 15, 2010. (See id. at 125.) The SSA initially denied the application on October 15, 2010. (Id. at 56.) On November 8, 2010, Plaintiff, who was represented by counsel, requested a hearing (see id. at 64), which was conducted by an ALJ on October 4, 2011 (see id. at 26-53). On October 12, 2011, the ALJ issued a written decision concluding that Plaintiff was not disabled within the meaning of the Social Security Act, and denying Plaintiff's application for Social Security disability benefits. (See id. at 7, 10.) Plaintiff subsequently requested that the SSA Appeals Council review the ALJ's unfavorable decision; on February 6, 2013, the Appeals Council denied his request for review, upholding the ALJ's decision and returning some of Plaintiff's proffered additional evidence. (See id. at 1-5.)

Meanwhile, on May 8, 2012—after the ALJ's decision, but before the Appeals Council's denial—Plaintiff applied for SSI benefits. (See SSA SSI: Not. of Award (Pl.'s Mem. of Law in Supp. of Pl.'s Cross Mot. for Remand ("Pl.'s Mem."), Ex. A) (Dkt. 26) at 1.)[3] On April 17, 2013, the SSA determined that for purposes of his eligibility for SSI, Plaintiff was disabled as of July 9, 2012. (Id. at 1, 2.) On June 4, 2013, the SSA further determined that

---

[3] Plaintiff's May 8, 2012, application is not part of the administrative record. (See Pl.'s Mem. at 2 n.7.) While Plaintiff has provided a copy of his Notice of Award of SSI benefits, this document does not indicate which conditions served as the basis for the SSA's subsequent determination that he was disabled. (See generally Not. of Award.) Plaintiff argues, however, that "the medical evidence before the Appeals Council for his first application is the same as that before the agency in his second application." (Pl.'s Resp. at 1.)

Plaintiff was eligible for DIB beginning in January 2013, based on the same disability onset date of July 9, 2012. (See SSA Retirement, Survivors and Disability Insurance: Not. of Award (Pl.'s Mem., Ex. A) at 1.)

Before the SSA's favorable determinations, however, on March 4, 2013, Plaintiff, proceeding pro se, filed the instant action pursuant to 42 U.S.C. § 405 (g), seeking judicial review of the SSA's February 5, 2013, decision denying his August 2, 2010, application for DIB based on an alleged onset date of May 15, 2010. (See Compl. (Dkt. 1).) On June 28, 2013, the Commissioner filed her Answer and the certified administrative record, and mailed a copy of the record to Plaintiff. (See Answer (Dkt. 10); R.; Not. of Mailing (Dkt. 9-1).) On August 21, 2013, attorney Ann P. Biddle filed a notice of appearance as counsel for Plaintiff in this case. (Not. of Appearance (Dkt. 11).)

Both the Commissioner and Plaintiff subsequently filed cross-motions for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). The Commissioner filed her motion on October 11, 2013. (See Mem. of Law in Supp. of Def.'s Mot. for J. on the Pleadings (Dkt. 24).) Plaintiff filed a cross-motion seeking remand on November 22, 2013. (See Pl.'s Mem.) The Commissioner filed a response to Plaintiff's cross-motion on December 20, 2013. (See Mem. of Law in Further Supp. of Def.'s Mot. for J. on the Pleadings & in Opp'n to Pl.'s Cross-Mot. for Remand ("Def.'s Resp.") (Dkt. 27).) Plaintiff filed his response to the Commissioner's motion on January 10, 2014. (See Pl's. Mem of Law in Further Supp. of Pl.'s Cross Mot. for Remand ("Pl.'s Resp.") (Dkt. 28).)

## III. LEGAL STANDARD

### A. Review of Final Determination of the Social Security Administration

Under Rule 12(c), "a movant is entitled to judgment on the pleadings only if the movant establishes 'that no material issue of fact remains to be resolved and that [the movant] is entitled

to judgment as a matter of law.'" Guzman v. Astrue, No. 09-CV-3928 (PKC), 2011 WL 666194, at *6 (S.D.N.Y. Feb. 4, 2011) (quoting Juster Assocs. v. City of Rutland, Vt., 901 F.2d 266, 269 (2d Cir. 1990)). "The role of a district court in reviewing the Commissioner's final decision is limited." Pogozelski v. Barnhart, No. 03-CV-2914 (JG), 2004 WL 1146059, at *9 (E.D.N.Y. May 19, 2004). "[I]t is up to the agency, and not [the] court, to weigh the conflicting evidence in the record." Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998). "A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000) (quoting 42 U.S.C. § 405(g)). "Substantial evidence means more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Moran v. Astrue, 569 F.3d 108, 112 (2d Cir. 2009) (quoting Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008)). Thus, as long as (1) the ALJ has applied the correct legal standard, and (2) his findings are supported by evidence that a reasonable mind would accept as adequate, the ALJ's decision is binding on this court. See Pogozelski, 2004 WL 1146059, at *9.

Where an ALJ has failed to apply the correct standard, or the ALJ's decision is not supported by substantial evidence, district courts are authorized to remand social security appeals pursuant to either the fourth or sixth sentences of 42 U.S.C. § 405(g). See Melkonyan v. Sullivan, 501 U.S. 89, 97-98 (1991) (citing Sullivan v. Finkelstein, 496 U.S. 617, 623-29 (1990)). The fourth sentence of § 405(g) authorizes courts to enter judgment "affirming, modifying, or reversing the decision of the [SSA], with or without remanding the cause for a rehearing." Id. at 98 (quoting 42 U.S.C. § 405(g)). Pursuant to the sixth sentence, the court "may . . . remand the case. . . for further action by the Commissioner." 42 U.S.C. § 405(g). In a

"sixth sentence remand," the court "does not rule in any way as to the correctness of the administration determination," but instead, remands the case "because new evidence has come to light that was not available to the claimant at the time of the administrative proceeding and that evidence might have changed the outcome of the prior proceeding." Melkonyan, 501 U.S. at 98.

## B. Determination of Disability

"To receive federal disability benefits, an applicant must be 'disabled' within the meaning of the Social Security Act." Shaw, 221 F.3d at 131; see also 42 U.S.C. § 423. A claimant is "disabled" within the meaning of the Act if he or she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment must be of "such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." Id. § 423(d)(2)(A).

The SSA has promulgated a five-step procedure for determining whether a claimant is "disabled" under the Act. See 20 C.F.R. § 404.1520(a)(4). In Dixon v. Shalala, 54 F.3d 1019 (2d Cir. 1995), the Second Circuit described this five-step analysis as follows:

> The first step in the sequential process is a decision whether the claimant is engaged in "substantial gainful activity." If so, benefits are denied.
>
> If not, the second step is a decision whether the claimant's medical condition or impairment is "severe." If not, benefits are denied.
>
> If the impairment is "severe," the third step is a decision whether the claimant's impairments meet or equal the "Listing of Impairments" . . . of the social security regulations. These are impairments acknowledged by the Secretary to be of sufficient severity to preclude gainful employment. If a claimant's condition

26

meets or equals the "listed" impairments, he or she is conclusively presumed to be disabled and entitled to benefits.

If the claimant's impairments do not satisfy the "Listing of Impairments," the fourth step is assessment of the individual's "residual functional capacity," i.e., his capacity to engage in basic work activities, and a decision whether the claimant's residual functional capacity permits him to engage in his prior work. If the residual functional capacity is consistent with prior employment, benefits are denied.

If not, the fifth and final step is a decision whether a claimant, in light of his residual functional capacity, age, education, and work experience, has the capacity to perform "alternative occupations available in the national economy." If not, benefits are awarded.

Id. at 1022 (internal citations omitted) (quoting Decker v. Harris, 647 F.2d 291, 298

(2d Cir. 1981)).

The "burden is on the claimant to prove that he is disabled." Balsamo v. Chater, 75, 80

(2d Cir. 1995) (quoting Caroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 642

(2d Cir. 1983)). But if the claimant shows at step four that his impairment renders him unable to

perform his past work, there is a limited shift in the burden of proof at step five that requires the

Commissioner to "show that there is work in the national economy that the claimant can do."

Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam).

In making the determinations required by the Social Security Act and the regulations

promulgated thereunder, "the Commissioner must consider (1) the objective medical facts; (2)

the medical opinions of the examining or treating physicians; (3) the subjective evidence of the

claimant's symptoms submitted by the claimant, his family, and others; and (4) the claimant's

education background, age, and work experience." Pogozelski, 2004 WL 1146059, at *10

(citing Carroll, 705 F.2d at 642). Moreover, "the ALJ conducting the administrative hearing has

an affirmative duty to investigate facts and develop the record where necessary to adequately

assess the basis for granting or denying benefits." Id.

## IV.   DISCUSSION

Plaintiff challenges the ALJ's determination that he was not disabled under the Social Security Act as of May 15, 2010. First, Plaintiff contends that his case should be remanded in light of new evidence. (See Pl.'s Mem. at 17-26; Pl.'s Resp. at 1-4.) Specifically, Plaintiff asserts that the evidence he sent to the Appeals Council in this action, the subsequent award of disability benefits pursuant to his second application, and the evidence he submitted as part of his second application, all warrant remand for reconsideration as "new and material" evidence. (See Pl.'s Mem. at 17.)

Second, Plaintiff argues that the ALJ failed to apply the legal standards set forth in SSA regulations when assessing his credibility. (See Pl.'s Mem. at 26-29; Pl.'s Resp. at 5-6.) In particular, Plaintiff claims that the ALJ first formulated Plaintiff's RFC and then compared Plaintiff's statements to that RFC. (Pl.'s Mem. at 28.) Plaintiff asserts that this method, which "puts the cart before the horse," constitutes legal error since a claimant's credible statements form part of the record, and the ALJ must consider the record as a whole when evaluating Plaintiff's RFC. (Id.) Additionally, Plaintiff alleges that the ALJ failed to comply with SSA regulations in weighing Plaintiff's statements about his conditions against the entire record. (Id. at 28-29.)

### A.   New Evidence

Plaintiff first argues that this case should be remanded for consideration of: (1) new materials in the administrative record not available to the ALJ at the time of the hearing but later submitted to the Appeals Council; (2) Plaintiff's subsequent favorable decision; and (3) evidence submitted in support of the second application. Specifically, Plaintiff argues that new evidence regarding his respiratory problems, joint disease and rheumatoid arthritis, and psychiatric problems constitute material evidence because they suggest that such conditions might be severe

and chronic, and thus, could reasonably lead the ALJ to change her decision at step two of the analysis. (Pl.'s Mem. at 21-22.)

A court cannot consider evidence not contained in the administrative record when reviewing the findings of the Commissioner. See Casiano v. Apfel, 39 F. Supp. 2d 326, 330-31 (S.D.N.Y. 1999) (adopted report and recommendation), aff'd, 205 F.3d 1322 (2d Cir. 2000) (unpublished table decision). However, the court may remand a case to the SSA to consider such evidence, "but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g); see Lisa v. Sec'y of Dep't of Health & Human Servs. of the United States, 940 F.2d 40, 43 (2d Cir. 1991) (discussing three-part test pursuant to which Plaintiff must demonstrate (1) that the evidence is new, (2) that the evidence is material, and (3) good cause for the failure to present the evidence earlier); see also Pollard v. Halter, 377 F.3d 183,193 (2d Cir. 2002) (discussing standard).

First, "new" evidence cannot be "merely cumulative of what is already in the record." Tirado v. Bowen, 842 F.2d 595, 597 (2d Cir. 1988) (quoting Szubak v. Sec'y of Health & Human Servs., 745 F.2d 831, 833 (3d Cir. 1984)).

Second, to be considered material, evidence must be "relevant to the claimant's condition during the time period for which benefits were denied and probative." Id. Evidence that demonstrates a disability acquired after the ALJ's decision, or a subsequent deterioration of the claimant's conditions after the decision, is not material and does not necessitate a remand. Cf., e.g., Tracy v. Apfel, No. 97-CV-4357 (JG), 1998 WL 765137, at *6 (E.D.N.Y. Apr. 22, 1998). While evidence that post-dates the ALJ's decision cannot be presumed to have no bearing on that decision, such new evidence can only be considered relevant to the extent that it "may disclose

the severity and continuity of impairments existing before the earning requirement date or may identify additional impairments which could reasonably be presumed to have been present." Pollard, 377 F.3d at 194 (quoting Lisa, 940 F.2d at 44). Courts have been inclined to find later evidence to be material where a diagnosis occurs after the proceedings that "sheds considerable new light on the seriousness of [a claimant's] condition," and the evidence supports that diagnosis. Lisa, 940 F.2d at 44 (alteration in original) (quoting Tolany v. Heckler, 756 F.2d 268, 272 (2d Cir. 1985)). Moreover, materiality requires "a reasonable possibility that the new evidence would have influenced the [Commissioner] to decide claimant's application differently." Pollard, 377 F.3d at 193 (alteration in original) (quoting Tirado, 842 F.2d at 597).

Finally, before new evidence can be considered, a claimant must demonstrate good cause for failing to present this evidence earlier. Tirado, 842 F.2d at 597; see also Tolany, 752 F.2d at 272 (finding good cause where new evidence was based on a later evaluation and assessment of claimant's response to medication required observation period).

## 1.    Evidence Considered by the Appeals Council

The court first considers whether remand is warranted based on evidence submitted by Plaintiff to the Appeals Council after the ALJ's decision. The issue is therefore not whether these materials are "new," since they are not, but whether they are material and justify remand.

In reviewing an appeal from an ALJ's decision, the Appeals Council will examine the entire record—including evidence submitted after the ALJ's decision—to determine whether the findings and conclusions of the ALJ are "contrary to the weight of the evidence currently of record." 20 C.F.R. § 404.970(b). Pursuant to SSA regulations, the Appeals Council considers newly submitted evidence only if it is new and material, and relates to the time period on or before the ALJ's decision. See 20 C.F.R. § 404.970(b). If however, the potential evidence does not relate to the relevant time period, the Appeals Council is required to return the evidence to

30

the claimant with an explanation of why the evidence was not accepted, and advise the claimant of his right to file a new application. See 20 C.F.R. § 416.1476(b)(1); Baladi v. Barnhart, 33 F. App'x 562, 564 n.1 (2d Cir. 2002) (summary order) (noting that if claimant submits new evidence that "relates to the applicant's condition after the date of the ALJ's decision, the Appeals Council is required to return the evidence" with instructions for filing new application); Miller v. Barnhart, No. 01-CV-2744 (DAB) (FM), 2004 WL 1304050, at *9 (S.D.N.Y. May 6, 2004) (adopted report and recommendation) (evidence properly returned where it involved treatment that began after date of ALJ's decision). Evidence submitted to the Appeals Council following an ALJ's decision becomes part of the administrative record for this court's review, even where the Appeals Council declines to engage in substantive review of the ALJ's decision. Perez v. Chater, 77 F.3d 41, 45 (2d Cir. 1996).

Here, Plaintiff argues that the new evidence he submitted to the Appeals Council constitutes sufficient justification for remand. Plaintiff claims that this new evidence shows that he suffered from chronic and severe conditions—notably asthma and respiratory problems, joint disease and rheumatoid arthritis, and other psychiatric problems—for which the ALJ failed to account in her decision. The Appeals Council returned a number of documents Plaintiff submitted as this new evidence, however, because the information referred to a period of time after the ALJ's October 12, 2011, decision.[4] (See R. at 2.) Since these returned documents were not part of the certified administrative record submitted to the court, but Plaintiff has also presented them as part of the evidence he submitted in connection with his subsequent favorable

---

[4] In evaluating Plaintiff's original application and determining the materiality of newly submitted evidence, the relevant time period runs from May 15, 2010, the date of onset of Plaintiff's alleged disability, to October 12, 2011, the date on which the ALJ rendered her decision.

application, they will be examined within the context of Plaintiff's second application, even though the documents were available to the Appeals Council.[5] See infra Part IV.A.3.

The Appeals Council did, however, incorporate some newly submitted evidence into the administrative record, and considered that evidence in denying Plaintiff's request for review. Specifically, the Appeals Council added "Claimant's Correspondence" (Exhibits B15E and B16E), Plaintiff's college transcript (Exhibit B17E), Plaintiff's request for review of hearing (Exhibit B17B), and documents entitled "Medical records University of S. Alabama Hospitals for the period 11/14/2010 - 5/24/2012" (Exhibit B19F). (R. at 2, 5.) Still, this newly added evidence does not provide a basis for remand.

The prescription records from Ozanam Charitable Pharmacy list medications and supplements that were prescribed both during and after the relevant time period. (See id. at 395-97.) This information is cumulative of the treatment notes contained in the original record and considered by the ALJ.[6] This is true as well of the medication summaries contained in Exhibits B16E and B19F. (Id. at 227, 387.) Further, the patient encounter summaries from Dr. Pita, which are included in Exhibits B16E and B19F, largely postdate the ALJ's decision and relate instead to Plaintiff's conditions in June 2012, after the relevant time period between

[5] Plaintiff asserts that evidence submitted to the Appeals Council and evidence submitted as part of the second application became part of the same electronic folder. (Pl.'s Cross Mot. at 18.) Plaintiff further claims that counsel investigated and "discovered no other documents in the second application that were not already in the electronic folder and administrative record." (Id.) The certified copy of the administrative record presented to this court, however, consists solely of the exhibits presented to the ALJ (Exhibits B1A, B1B-B16B, B1D-B4D, B1E-B14E, B1F-B18F), and evidence added by the Appeals Council (Exhibits B17B, B15E-B17E, B19F)—and not documents that were submitted in connection with Plaintiff's subsequent application or documents that were returned by the Appeals Council. (See R. at 2, 5, 27.) As a result, this court will evaluate evidence considered by the Appeals Council and included in the physical copy of the administrative record received by the court separately from evidence submitted as part of Plaintiff's second application.

[6] As the court has already noted, new evidence cannot be "merely cumulative of what is already in the record." Tirado, 842 F.2d at 597 (quoting Szubak, 745 F.2d at 833). In characterizing evidence as cumulative of material already in the record, numerous courts have used the phrase "duplicative and cumulative" without distinguishing the between the two terms, or elaborating on the meaning of this phrase. In this Memorandum and Order, a document is "duplicative and cumulative" when it is a facsimile of a document already contained in the original administrative record considered by the ALJ. A document is "cumulative" when the information it contains is already provided to some extent elsewhere in the administrative record.

May 15, 2010 and October 12, 2011. (See id. at 225, 389-90, 394.) The one exception is a patient encounter summary that reflects Plaintiff had been diagnosed with bipolar disorder in July 2011, of which the ALJ was fully aware.

The only other reference to the relevant time period is in the lists of medications—which are also cumulative of information contained within Plaintiff's medical records already examined by the ALJ—and a July 12, 2011, blood test, the results of which are discussed in Dr. Pita's records and reviewed by the ALJ. Moreover, these terse documents do not provide any information regarding the severity of Plaintiff's alleged severe and chronic conditions, or the symptoms he experienced. Instead, these documents merely reflect the conditions treated, each of which was documented in the original administrative record, and the medications prescribed, nearly all of which were already accounted for in the original record. Furthermore, the Physical Capacities Evaluation (contained in Exhibit B19F) signed by Dr. Pita on August 3, 2011, is duplicative and cumulative of the copy contained in the original administrative record examined by the ALJ. (Compare id. at 402, with id. at 370.)

Additionally, neither the April 24, 2012, letter from the Alabama Department of Industrial Relations Unemployment Compensation Agency (informing Plaintiff that no further payment could be made on his High Unemployment Extended Benefit claim), nor the March 14, 2012, letter from Bishop State Community College (denying Plaintiff's appeal for reinstatement of his financial aid) relate to the relevant time period, and more importantly, do not furnish any information about Plaintiff's conditions at any point. (See id. at 221, 222.) Likewise, the medical billing statements in Exhibit B19F and Notice of Court Action contained in Exhibit B16E (and repeated in Exhibit B19F), as well as the letter from the Waterfront Rescue Mission dated April 19, 2012 (contained in both Exhibit B16E and Exhibit B19F), do not shed

33

any light on Plaintiff's conditions or symptoms at any point, and consequently, are not material. (See id. at 223, 224, 381-85, 392, 405, 406.)

Moreover, the May 5, 2012, letter from the Alabama Department of Human Resources informing Plaintiff that he had been approved for food stamps, and the September 30, 2011, letter from Wave Transit System informing Plaintiff that he had been approved for "ADA Paratransit (M.A.P.) Services" are also not material because they do not furnish any additional information about Plaintiff's conditions during the relevant time period. (See id. at 383, 403.) These documents provide no more information about his symptoms than the denials of benefits discussed above. Further, the May 5, 2012, approval for food stamps was sent long after the relevant time period. While the approval for M.A.P. services was dated before the end of the relevant time period, it is still not material because it provides no information about why Plaintiff was eligible for these services, or any of Plaintiff's conditions or symptoms more generally.

Furthermore, the records contained in Exhibit B19F regarding Plaintiff's May 2012 hospitalization, in connection with the procedure performed on his right lung, are not material. (See id. at 407-09.) Despite Plaintiff's claims that his asthma and respiratory problems were chronic and severe conditions during the relevant time period, these documents simply indicate a subsequent deterioration in Plaintiff's respiratory problems in May 2012—seven months after the relevant time period. Moreover, these records discuss only the procedure performed without mentioning any chronic condition that may have existed at the time of the ALJ's decision. Although Plaintiff spent nearly two weeks in the hospital at that time, the fact that he was hospitalized for a single procedure in May 2012 does not indicate that his asthma and related respiratory problems were worse than the ALJ originally believed they were in October 2011.

34

Remand is also not justified by Plaintiff's correspondence with the SSA or his college transcript from Faulkner State College. These documents simply fail to shed more light on Plaintiff's conditions during the time period in question. (See id. at 197-215, 217, 220, 229.) In his letters, Plaintiff lists the medication he was prescribed and references the treatment he received for his various conditions in 2012; but this communication does not provide any new information about Plaintiff's condition as it existed during the relevant time period. While Plaintiff's transcript from Faulkner State College demonstrates that he performed poorly in school during the 2010-11 academic year, Plaintiff suggests no reason why this shows his medical condition was worse than originally believed during the relevant time period.[7]

Because the documents added to the administrative record by the Appeals Council are not material, they fail to warrant remand of this case.

### 2. Plaintiff's Subsequent Favorable Decision

Plaintiff also contends that the SSA's subsequent favorable decision, on its own, constitutes new and material evidence that warrants remand. In support of his claim, Plaintiff cites a number of district court cases for the proposition that a subsequent favorable decision can be considered as such. (See Pl.'s Mem. at 20-23; Pl.'s Resp. at 3-4.) These cases, however, are inapposite. For example, in Clemons v. Astrue, No. 12-CV-269A, 2013 WL 4542730, at *6 (W.D.N.Y. Aug. 27, 2013) (adopted report and recommendation), the court found that a subsequent decision was material where the onset date in the second application was one day after the original ALJ's decision, and the second ALJ referenced time frames and information

---

[7] In questioning Plaintiff's credibility, the ALJ emphasized the fact that Plaintiff attended college while claiming to be unable to work. (See R. at 17.) As a result, Plaintiff argues that evidence that he was failing his classes is new and material with respect to this credibility determination. (Pl.'s Mem. at 20-21.) Because the court ultimately remands this case to the SSA in light of separate legal errors with respect to the ALJ's credibility determination, see infra Part IV.B, the court need not—and therefore does not—address whether this evidence alone justifies remand. Nevertheless, on remand, the ALJ is instructed to review the entire record, including Plaintiff's educational records, which Plaintiff did not submit until after the ALJ's decision, but which the Appeals Council was willing to consider.

adjudicated by the original ALJ. Similarly, in <u>Mikol v. Barnhart</u>, 554 F. Supp. 2d 498, 503-05 (S.D.N.Y. 2008), the court found that a subsequent favorable decision constituted grounds for reconsideration where the alleged onset date was one day after the original ALJ's denial, and the second ALJ discussed conditions that the first ALJ addressed.

The circumstances in this case, however, contrast sharply with those in the cases Plaintiff cites. First, the onset date in Plaintiff's subsequent favorable decision is not close in time to the ALJ's decision in Plaintiff's first application. The ALJ in this case rendered her decision on October 12, 2011. When Plaintiff was awarded SSI benefits on April 17, 2013, however, the disability onset date was July 9, 2012. (SSA SSI, Not. of Award at 2.) Consequently, there was a nine-month gap between the ALJ's decision and the date of onset for Plaintiff's disability in the second case. Moreover, even when it approved Plaintiff's subsequent application, the SSA pushed back the date of onset from what Plaintiff originally alleged—May 8, 2012. (<u>See id.</u> at 1-2.) If anything, this further supports finding that Plaintiff was not eligible for disability benefits during the time period relevant in this case, since the SSA—in <u>approving</u> his second application—rejected Plaintiff's claim that he was disabled between May and July 2012. Moreover, the SSA rejected Plaintiff's claim of disability during this period notwithstanding the fact that Plaintiff was hospitalized for respiratory problems between May 13 and May 25, 2012. This suggests that it was only after this hospitalization that Plaintiff's condition sufficiently deteriorated to render him disabled.[8]

_____

[8] The Second Circuit has repeatedly rejected claimants' efforts to include subsequent favorable decisions as new and material evidence where the new decision reflects a worsening of conditions. <u>See, e.g.</u>, <u>Rivera v. Colvin</u>, 592 F. App'x 32, 32-33 (2d Cir. 2015) (summary order) (subsequent favorable decision was not material where it rested upon finding that claimant's conditions grew worse following relevant time period, rather than different assessment of same evidence evaluated in original decision (citing <u>Cage v. Comm'r of Soc. Sec.</u>, 692 F.3d 118, 127 (2d Cir. 2012) (denying challenge to sufficiency of the evidence based in part on subsequent favorable decision because more recent decision was "based on evidence not in the record on the original application, related in part to different impairments than those at issue in the original application, and expressly stated that the ALJ saw no basis for reopening the original application"))).

Second, Plaintiff's subsequent favorable decision was administered via form letter from the SSA, and does not include any reasoning, or even any reference to the conditions that rendered him disabled—let alone those that were present in Plaintiff's first application. Thus, unlike the cases upon which Plaintiff relies, this court has no subsequent analysis to clarify the SSA's decision-making process. Cf. Clemons, 2013 WL 4542730, at *6; Mikol, 554 F. Supp. 2d at 503-05. As a result, this court has no way to determine—especially in light of the later-submitted evidence indicating a deterioration of Plaintiff's conditions—whether the subsequent favorable decision reflects a worsening of Plaintiff's conditions or a reexamination of the same conditions and evidence.

Given these differences, the court finds that Plaintiff's subsequent favorable decision does not constitute material evidence because it is not probative with respect to the relevant time period.[9] Accordingly, Plaintiff's subsequent favorable decision does not warrant remand of this case.

### 3. Evidence Submitted as Part of Second Application

Finally, Plaintiff alleges that the evidence submitted in support of his second application constitutes new and material evidence that justifies remand under 42 U.S.C. § 405(g). Much of

---

[9] Additionally, the case law reflects doubt that a subsequent favorable decision can be considered new evidence for sixth-sentence purposes in the first place. See Davidson v. Colvin, No. 1:12-CV-316 (MAD) (VEB), 2013 WL 5278670, at *10 (N.D.N.Y. Sept. 18, 2013) (adopted report and recommendation). For example, the Sixth Circuit has held that a subsequent favorable decision is not itself new and material evidence under § 405(g), but that it may be supported by evidence that is new and material. Allen v. Comm'r of Soc. Sec., 561 F.3d 646, 652-54 (6th Cir. 2009). Other circuit courts have followed suit. See, e.g., Baker v. Comm'r of Soc. Sec., 520 F. App'x 228, 229 n.* (4th Cir. 2013) (unpublished per curiam decision) (rejecting claimant's request for remand based on a subsequent decision in light of claimant's failure to meet burden of showing evidence relied on in second application was pertinent to the original appeal (citing Allen, 561 F.3d at 653)); Cunningham v. Comm'r of Soc. Sec., 507 F. App'x 111, 120 (3d Cir. 2012) (unpublished per curiam decision) (finding remand or reversal based upon a subsequent decision "would be appropriate only if that decision was based upon new and material evidence" that claimant had good cause for not raising earlier (citing Allen, 561 F.3d at 652-53)). Recently, in Caron v. Colvin, 600 F. App'x 43 (2d Cir. 2015) (summary order), the Second Circuit, too, cited Allen for the proposition that "[t]he mere existence of the subsequent decision in [a claimant's] favor, standing alone, cannot be evidence that can change the outcome of his prior proceeding." Id. at 44 (quoting Allen, 561 F.3d at 653). In Caron, however, the court also noted that the subsequent favorable decision was not relevant to an earlier claim because it expressly stated that it did not address the merits of previous claims and was limited to a later time period. Id.

the evidence Plaintiff submits, however, is not actually new, since it had been reviewed and returned by the Appeals Council. As the court already discussed, see supra Part IV.A.1, the Appeals Council returned these materials to Plaintiff—in accordance with SSA regulations—with instructions that if he wanted the SSA to consider whether he was disabled after October 12, 2011, he would need to file a new claim. (See R. at 2.) Moreover, even if the Appeals Council had not previously returned a large portion of this evidence, none of the evidence submitted with Plaintiff's second application meets the new-evidence standard for various other reasons.

First, evidence that predates Plaintiff's alleged onset date of May 15, 2010—such as the USAMC Outpatient Record dated September 12, 2005, the USAMC Records from July 2002, and the USAMC Outpatient Record dated June 10, 2008—should have been submitted with Plaintiff's first application, or made available to the ALJ before she rendered her decision. Because Plaintiff has not provided any explanation for why these documents were not submitted earlier, he fails the good-cause prong of the three-part test for new and material evidence. See Pollard, 377 F.3d at 193. Although Plaintiff argues that all of his proposed new evidence had been previously submitted to the Appeals Council in this action, or as part of the second application (Pl.'s Mem. at 24), the Appeals Council made no mention of these documents as having been either considered or returned (see R. at 2).

Moreover, these documents do not shed any light on Plaintiff's symptoms during the relevant time period. Nor do they evidence his now-claimed asthma, joint deformities, rheumatoid arthritis, and psychiatric problems. Additionally, the USAMC Outpatient Record dated September 12, 2005, is not material because it involves a diagnosis of a cough, sore throat, and fever, none of which are conditions at issue in Plaintiff's application. (See Pl.'s App.

38

(Dkt. 26-1) at 415-17.) While Plaintiff does allege that his asthma and respiratory problems were chronic and serious conditions—and a cough and sore throat could be related to these conditions—these medical records are not probative, and therefore immaterial, with respect to whether Plaintiff was disabled between May 15, 2010, and October 12, 2011. A cough and sore throat in 2005 are simply too insignificant and temporary to be relevant to Plaintiff's alleged chronic and severe conditions between May 2010 and October 2011. Furthermore, the USAMC records from 2002 are duplicative and cumulative of what is already in the record regarding Plaintiff's Achilles tendon surgery in July 2002. (Compare id. at 418-23, with R. at 230-35.) And the USAMC records dated June 10, 2008, are not material because they involve treatment primarily for abdominal pain, which is not a condition Plaintiff alleges entitles him to disability benefits. (See Pl.'s App. at 424-26.)

Second, certain items that are from the relevant time period—namely, the prescription list from Ozanam Charitable Pharmacy dated October 11, 2011, the Mobile County Health Department Referral Consult Order dated September 30, 2011, the USAMC Outpatient Record dated November 8, 2010, and the USAMC Emergency Department Medical Screening/Nursing Assessment dated November 8, 2010—are duplicative and cumulative of information already contained in the administrative record. (See id. at 428-31, 435, 583-85.) Specifically, the Appeals Council had already incorporated the prescription list, which is itself cumulative of reports that had previously been examined by the ALJ. Similarly, the November 8, 2010, records were contained in the original administrative record that the ALJ reviewed prior to rendering her decision. (See R. at 304-10.) The Notice of Appeals Council Action, dated April 17, 2011, is also duplicative and cumulative of the copy that is already contained in the administrative record. (Compare R. at 1-5, with Pl.'s App. at 569-75, repeated at 576-82.)

Third, the evidence that was submitted to and returned by the Appeals Council, but Plaintiff later included in his second application, is not material. Included in this group were a Behavioral Health Evaluation dated November 20, 2012; a Patient Summary dated December 2012; records from MMHC dated November 20, 2012; records from the USAMC and Mobile Infirmary dated May and June 2012; records from the University of South Alabama Hospital dated November 2011; a M.A.P. application dated November 2011; records from New York University Hospital; a listing of prescribed medication; and medical receipts that Plaintiff submitted. (R. at 2.) The Appeals Council determined that these documents contained information about a later time, and thus, did not affect whether Plaintiff was disabled beginning on or before October 12, 2011. (Id.) Plaintiff then included these documents with his second application.

Primarily, these documents postdate the relevant time period and, at best, illustrate that Plaintiff's psychiatric and physical symptoms worsened after October 2011. It is true—as Plaintiff argues (Pl.'s Resp. at 2)—that evidence cannot be rejected simply because it postdates an ALJ decision; and newer evidence of the severity of a condition could imply that the condition was more severe than believed at the earlier time. See Pollard, 377 F.3d at 193. The documents at issue, however, compel no such conclusion. The bulk of these documents consists of billing statements regarding medical procedures, prescriptions, medication lists, and blood test results. (See Pl.'s App. at 445-47, 450, 458-61, 475-80.) The medication lists are cumulative of information that was already contained in the administrative record and reviewed by the ALJ. The many billing statements make no reference to the severity of Plaintiff's conditions either during or after the relevant period. Likewise, the other documents in this set simply establish that Plaintiff sought further medical treatment after the relevant time period. As a result, they

40

shed no new light on Plaintiff's conditions during the time period relevant for his first application.

Similarly, the documents more directly related to the medical care Plaintiff sought for his symptoms after the ALJ rendered her decision on October 12, 2011, are not material because they are not probative of Plaintiff's symptoms during the relevant time period. The documents primarily show that Plaintiff sought treatment for various ailments in 2011 and 2012, and suggest only that Plaintiff's symptoms possibly worsened after the relevant time period. The instructions and follow-up care form from USAMC dated November 29, 2011, contains largely illegible and cursory instructions that appear to relate to Plaintiff's joint pain, asthma, and bipolar disorder. (Id. at 433.) From what can be gleaned from the document, it appears Plaintiff was treated for these conditions and prescribed medication. However, the document does not appear to discuss the severity of Plaintiff's symptoms—let alone indicate that they were worse than originally believed—between May 2010 and October 2011. Moreover, the severity of Plaintiff's symptoms related to these conditions during the relevant time period is well documented in the administrative record.

Plaintiff's application for M.A.P., which was verified by Dr. Pita on December 5, 2011, demonstrates that Plaintiff applied for these services after the ALJ hearing on the basis of disability caused by rheumatoid arthritis. (Id. at 437-43.) Plaintiff's difficulty getting around, however, was also well documented at the time of the ALJ hearing, as Plaintiff indicated in his August 7, 2010, Function Report. (R. at 158, 161.) The ALJ was also aware that Plaintiff relied on public transportation, and no longer had a driver's license because of a 1994 conviction for driving under the influence. (See id. at 36.) More importantly, this document does not provide any indication that Plaintiff's physical or mental limitations were worse than originally believed

41

by the ALJ. Indeed, in the application, Plaintiff stated that he was capable of walking to the bus by himself, and the portion that Dr. Pita completed indicated that Plaintiff was able to climb steps and walk a quarter of a mile without assistance. Consequently, this document does not provide any material evidence with respect to Plaintiff's symptoms during the relevant time period. This is especially true where Plaintiff has provided the court with no explanation for why Plaintiff's acceptance into this program demonstrates Plaintiff's condition had deteriorated.

The June 2012 records from USAMC and its Mobile Infirmary are not material because they involve treatment after the relevant time period. These documents include a discharge planning assessment, which lists Plaintiff's diagnosis on five axes—one of which is asthma—but does not describe Plaintiff's ailments in any detail. (Pl.'s App. at 451.) This set of documents also includes a nursing discharge summary, which also contains no description of Plaintiff's symptoms or conditions. (Id. at 452-56.) While it does include a list of medications, this list was already included in the original administrative record. (See id. at 453.) Consequently, these documents are not material because they fail to show that Plaintiff's conditions were worse than originally believed during the relevant time period.

The same analysis applies to the documents related to the NYU Medical Center discharge plan dated October 12, 2012. (See id. at 481-90.) The discharge plan includes another list of medications, the majority of which were already contained in the administrative record. (Id. at 482.) While this packet provides more detail than do the USAMC documents—by including a clinical assessment of Plaintiff's shortness of breath and blood tests displaying abnormal levels—they still lack sufficient information to conclude that Plaintiff's conditions were worse than originally believed between May 2010 and October 2011. (See id. at 483-90.) At most, these documents indicate that Plaintiff's condition deteriorated after the relevant time period.

42

This is also true of the Patient Summary dated December 2012, which lists Plaintiff's "active problem[s]" and medications. (Id. at 499.) The conditions and medications listed are largely cumulative of information that already contained in the administrative record. There are also no details regarding Plaintiff's symptoms. As a result, this document fails to provide further information about Plaintiff's conditions during the relevant time period. If anything, these lists indicate that Plaintiff's conditions worsened after October 2011—in particular, Plaintiff's lungs and psychiatric health. Still, none of these materials are probative with respect to Plaintiff's original application.

The only document of this group that might theoretically provide any insight into the severity of Plaintiff's conditions before October 2011 is the Behavioral Health Walk-In Evaluation Note dated November 20, 2012. (Id. at 501-03.) This document indicates that Plaintiff informed the facility that he had become increasingly irritable after being displaced from his shelter, and that he was seeking medication. (Id. at 501.) Plaintiff further reported that he attempted suicide twice, once in 2002 and again in August 2012. (Id.) While Plaintiff argues this constitutes new evidence of the severity of his psychiatric conditions, this particular report does not relate to the relevant time period. Instead, it demonstrates that Plaintiff's psychiatric conditions became worse in late 2012—when they resulted in a suicide attempt ten months after the ALJ's decision—and escalated when he was unable to take his medication. Moreover, Plaintiff's characterization of the 2002 incident as a suicide attempt contradicts contemporaneous reports (contained in the original administrative record) in which Plaintiff denied it was a suicide attempt. (See R. at 237-45.) Additionally, the document's list of medications and diagnoses is cumulative of what is already in the administrative record. Further, while the information about Plaintiff's medical and psychiatric history and medications could be construed as relating to the

relevant time period, this information is also cumulative of evidence already contained in the administrative record. Since this document does not shed any new light on Plaintiff's conditions at the time of the ALJ's decision, it is not material.

In sum, since none of the documents returned by the Appeals Council and submitted as part of Plaintiff's second application are both new and material with respect to Plaintiff's conditions during the time period relevant to the first application, they do not justify remand.

Fourth, a number of documents submitted with the second application, but not to the Appeals Council in the first instance, are not material to Plaintiff's first application because they do not bear on the severity of Plaintiff's conditions during any time period. This group includes letters from the SSA seeking Plaintiff's records from various medical institutions; letters from "Gulf Study" related to Plaintiff's participation in a survey about the potential health effects of oil-spill clean-up (related to his work after the Deepwater Horizon disaster in 2010); documents related to Plaintiff's failure to pay rent on his storage facility and a restraining order he obtained against U-Haul in August 2012; a statement dated November 2012 from Plaintiff that he is no longer represented by attorney Kevin Green; forms signed by Plaintiff authorizing medical facilities to disclose information to the SSA; letters from the SSA to Plaintiff's lawyers regarding Plaintiff's hearing request; status sheets related to Plaintiff's claims; letters from the SSA to Plaintiff reminding him to attend his scheduled examinations; fax cover sheets; invoices; and blank forms related to Plaintiff's recent medical treatment, medications, and work background, among other things. Because these documents fail to so much as mention Plaintiff's symptoms and conditions, they are clearly not material.

Fifth, a number of documents that were not submitted to the Appeals Council but which pertain in some sense to Plaintiff's conditions are not material because they postdate the relevant

44

time period. This group includes records related to a prescription for ProAir dated August 6, 2012; a November 26, 2012, notice from FEGS WECARE Social Security Unit, advising Plaintiff to call with any questions regarding his application; October 17, 2012, results for blood and urine tests ordered by WECARE; and a copy of Plaintiff's NYS Benefit Card printed on October 3, 2012. (See id. at 448-49, 463-66, 468, 474, 491, 492-93, 505.) These documents are not probative of Plaintiff's conditions between May 15, 2010, and October 12, 2011. While the blood test results might suggest a potential condition related to Plaintiff's cholesterol levels, the administrative record already contains information about Plaintiff's hypercholesterolemia, which is not a condition Plaintiff alleges to be severe. Thus, none of the documents in this group provide any material evidence about the state of Plaintiff's symptoms during the relevant time period.

*       *       *       *

Because none of Plaintiff's proffered evidence is new and material, and newly submitted for good cause, the court DENIES Plaintiff's motion for remand pursuant to § 405(g) on this basis.

### B.     Credibility Assessment

Plaintiff also argues that the ALJ failed to assess properly his subjective accounts of symptoms with respect to leg pain, depression, joint deformities, and psychological problems. (See Pl.'s Mem. at 26-29.) Specifically, Plaintiff contends that the ALJ first determined Plaintiff's RFC and then compared that RFC to the record, which Plaintiff claims is legal error justifying remand. (See id. at 28.) Further, Plaintiff argues that the ALJ failed to follow the proper two-step analysis in assessing Plaintiff's credibility, which—according to Plaintiff—also constitutes legal error warranting remand. (Id. at 28-29.) Plaintiff is correct on both counts: By determining Plaintiff's RFC prior to examining Plaintiff's credibility, and failing to follow the

45

credibility assessment process set forth in SSA regulations, the ALJ committed legal error that requires remand under 42 U.S.C. § 405(g).

Under certain circumstances, subjective reports of pain can support a finding of disability. Snell v. Apfel, 177 F.3d 128, 135 (2d Cir. 1999); see also Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam) (noting ALJ must take a claimant's report of pain and symptoms into account in rendering decision on disability (citing 20 C.F.R. § 416.929; McLaughlin v. Sec'y of Health, Educ. & Welfare, 612 F.2d 701, 704-05 (2d Cir. 1980))). However, an ALJ is not required to accept blindly a claimant's reports, but rather, "may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." Id. at 49 (citing Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979)). In assessing a claimant's credibility, the ALJ's reasoning must be "set forth with sufficient specificity to permit intelligible plenary review of the record." Hilsdorf v. Comm'r of Soc. Sec., 724 F. Supp. 2d 330, 350 (E.D.N.Y. 2010) (quoting Williams v. Bowen, 859 F.2d 255, 260-61 (2d Cir. 1988)).

The regulations set forth a two-step process to evaluate a claimant's credibility. See 20 C.F.R. § 404.1529(a). First, the ALJ determines whether medical signs or laboratory findings show the existence of an impairment which "could reasonably be expected to produce the pain or other symptoms alleged." Id.; see also SSR 96-7p, 1996 WL 374186, at *1 (July 2, 1996). If the statements about pain or other symptoms are unsupported by medical evidence, they cannot, on their own, establish that the claimant is disabled. See 20 C.F.R. § 404.1529(a).

Where the medical evidence alone does not substantiate a claimant's subjective reports of pain, the ALJ must evaluate the credibility of the claimant's statements in light of the following factors: (1) claimant's daily activities; (2) the location, duration, frequency, and intensity of

claimant's pain or other symptoms; (3) precipitating and aggravating factors; (4) the type,

dosage, effectiveness, and side effects of any medication claimant takes or has taken to alleviate

pain or other symptoms; (5) treatment—other than medication—claimant receives or has

received for relief of his pain or other symptoms; (6) any measures taken to relieve the

symptoms; and (7) other factors concerning claimant's functional limitations and restrictions due

to pain or other symptoms. Id. § 404.1529(c)(3); see also Hilsdorf, 724 F. Supp. 2d at 349-50.

    If the medical evidence does substantiate a claimant's reported symptoms, the ALJ

proceeds to the second step of the analysis, and evaluates the "intensity and persistence" of the

claimant's symptoms to determine the extent to which they limit the claimant's capacity to work.

See 20 C.F.R. § 404.1529(c); see also, e.g., Monroe v. Astrue, No. 12-CV-1456 (WFK), 2014

WL 3756351, at *5 (E.D.N.Y. July 30, 2014) (describing the two-step analysis). In conducting

this evaluation, the ALJ examines not just objective medical evidence, but also other evidence

that may suggest a "greater severity of impairment than can be shown by objective medical

evidence alone." 20 C.F.R. § 404.929(c)(3). The ALJ also considers a claimant's statements

about the "intensity, persistence, and limiting effects" of the symptoms alleged "in relation to the

objective medical evidence and other evidence." Id. § 404.929(c)(4).

    In this case, the ALJ found that Plaintiff's medically determinable impairments could

reasonably be expected to cause the alleged symptoms, but that Plaintiff's "statements

concerning the intensity, persistence[,] and limiting effects of these symptoms are not credible to

the extent they are inconsistent with the above residual functional capacity assessment." (R.

at 14-15.) Thus, the ALJ correctly performed the first step of the analysis by determining that

Plaintiff's impairments could reasonably be expected to cause his alleged symptoms. The ALJ

erred, however, at the second step of the analysis when she failed to determine whether

Plaintiff's statements were substantiated by objective medical evidence. Instead, the ALJ found that Plaintiff's statements were not credible because they did not match her determination of Plaintiff's RFC. This is not the appropriate standard. See Genier, 606 F.3d at 50.

In fact, the ALJ committed legal error in her credibility analysis in two ways. First, she applied the incorrect standard by comparing Plaintiff's statements to the RFC assessment she created. Second, her analysis was limited to the single finding that Plaintiff's statements did not match the RFC, and an observation that Plaintiff was attending school full-time while collecting unemployment. The ALJ thus failed to follow the SSA regulations in a second way—by not discussing or weighing Plaintiff's statements in light of the factors listed in 20 C.F.R. § 404.1529 (c)(3), or otherwise providing a record that would permit meaningful review.

### 1. Use of ALJ's Assessment of RFC

The ALJ first erred in finding that Plaintiff's "statements regarding the intensity, persistence, and limiting effects of [his] symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (Id. at 15-16.) The use of this language "gets things backwards" since "the passage implies that ability to work is determined first and is then used to determine the claimant's credibility." Bjornson v. Astrue, 671 F.3d 640, 645 (7th Cir. 2012).[10] Other courts within this circuit have reached this conclusion as well. See, e.g., Otero v. Colvin, No. 12-CV-4757 (JG), 2013 WL 1148769, at *7 (E.D.N.Y. Mar. 19, 2013) ("[I]t makes little sense to decide on a claimant's RFC prior to assessing her credibility. It merely compounds the error to then use that RFC to conclude that a claimant's subjective complaints are unworthy of belief."). Indeed, the governing regulation, 20

---

[10] This language also mimics boilerplate statements that appear in numerous ALJ decisions. The Seventh Circuit has repeatedly criticized such language as "meaningless boilerplate" where it "fails to link the conclusory statements made with objective evidence in the record." Pepper v. Colvin, 712 F.3d 351, 367 (7th Cir. 2013) (citing Parker v. Astrue, 597 F.3d 920, 922 (7th Cir. 2010)).

C.F.R. § 404.1529(c) indicates that the credibility determination must occur before the residual capacity assessment because "the credibility assessment is used to determine Plaintiff's limitations and [residual functional capacity]." Faherty v. Astrue, No. 11-CV-02476 (DLI), 2013 WL 1290953, at *16 (E.D.N.Y. Mar. 28, 2013). Moreover, ALJs must make their RFC determinations based upon all the evidence of record, "rather than self-formulate them and then compare them to . . . the record." Mitchell v. Colvin, No. 09-CV-5429 (ENV), 2013 WL 5676289, at *7 (E.D.N.Y. Oct. 17, 2013). Thus, an ALJ cannot claim that Plaintiff's testimony is not credible because it fails to correspond to the RFC when that testimony is what should be used to determine the RFC. Faherty, 2013 WL 1290953, at *16.

Here, the ALJ's conclusory statement at the second step of her credibility analysis constitutes legal error because it indicates that she first established Plaintiff's RFC and then made her credibility determination on the basis of that RFC assessment. This does not comply with the SSA regulations, which state that a claimant's statements about his symptoms and the credibility determination must precede the RFC assessment. See 20 C.F.R. § 404.1545(a)(3) ("[T]o assess your residual functional capacity . . . [w]e will also consider descriptions and observations of your limitation from your impairment(s), including limitations that result from your symptoms, such as pain, provided by you . . . ."). Thus, the ALJ committed legal error.

### 2. Failure to Permit Intelligible Review

The erroneous use of this language, however, does not require remand "[i]f the ALJ has otherwise explained [her] conclusion adequately." Torres v. Comm'r of Soc. Sec., No. 13-CV-330 (JFB), 2014 WL 69869, at *14 (E.D.N.Y. Jan. 9, 2014) (quoting Filus v. Astrue, 694 F.3d 863, 868 (7th Cir. 2012)). But, as the court has already noted, an ALJ is required to set forth the reasoning supporting her credibility findings "with sufficient specificity to permit

intelligible review of the record." Hilsdorf, 724 F. Supp. 2d at 350 (quoting Williams, 859 F.2d at 260-61). Here, the ALJ did not.

In her decision, the ALJ affirmed that she had engaged in "careful consideration of the evidence" prior to arriving at her assessment of Plaintiff's credibility. (Id. at 14.) While she did describe both Plaintiff's testimony and the medical evidence (see id. at 14-17), the ALJ did not sufficiently explain the reasoning underlying her credibility determination. In her sole reference to Plaintiff's credibility—other than her erroneous comparison to Plaintiff's RFC—the ALJ emphasized that Plaintiff's records indicated he was looking for a job as late as April 2011, and that he had attended school full-time while collecting unemployment, noting that Plaintiff was "basically training to do a job[] he claims that he is disabled from doing." (Id. at 17.) As a result, she concluded his credibility was "sorely lacking." However, this explanation does not permit "intelligible plenary review of the record." Williams, 859 F.2d at 260-61.

Having found that the medical evidence did substantiate Plaintiff's reported symptoms, the ALJ should have proceeded to evaluate the "intensity, persistence, and limiting effects" of his symptoms to determine the extent to which they limited his capacity to work. See 20 C.F.R. § 404.1529(c); see also, e.g., Monroe, 2014 WL 3756351, at *5. In doing so, the ALJ should have explicitly compared Plaintiff's reported symptoms about the "intensity, persistence, and limiting effects" to all of the other evidence in the record to determine whether Plaintiff's impairments might be more severe than indicated by the objective medical evidence alone. See 20 C.F.R. § 404.929(c)(3), (4). However, the ALJ's decision does not reflect that she conducted this analysis. For example, the ALJ should have discussed the effect on his credibility of Plaintiff's well documented medical treatment during the time period in question, including his various medications. See Correale-Englehart v. Astrue, 687 F. Supp. 2d 396, 437

(S.D.N.Y. 2010) (adopted report and recommendation). Instead, the ALJ's conclusory statement reflects that she considered only Plaintiff's collection of unemployment benefits, attendance at community college, and her own RFC assessment in appraising Plaintiff's credibility, rather than "all of the available evidence" as stipulated by the SSA regulations. See 20 C.F.R. § 404.1529(c)(1).

While the ALJ need not "explicitly reconcile each piece of evidence" she considered in her decision, it must be clear that she "weighed all of the evidence of [P]laintiff's symptoms, both subjective and objective." Cf. Felix v. Astrue, No. 11-CV-3697 (KAM) 2012 WL 3043203, at *9 (E.D.N.Y. July 24, 2012) (quoting Ahern v. Astrue, No. 09-CV-5543 (JFB), 2011 WL 1113534, at *6 (E.D.N.Y. Mar. 24, 2011)). Here, it is not clear that the ALJ weighed all of the evidence, at least in a way that permits "intelligible review" of the record. The ALJ failed to "identify what facts [s]he found to be significant, [or] indicate how [s]he balanced the various factors." Kane v. Astrue, 942 F. Supp. 2d 301, 314 (E.D.N.Y. 2013) (quoting Simone v. Astrue, No. 08-CV-488, 2009 WL 2992305, at *11 (E.D.N.Y. Sept. 16, 2009)); see also SSR 96-7P, 1996 WL 374186, at *2 (ALJ's credibility finding should be "sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight"). The court notes that failure to methodically follow the two-step analysis does not automatically require remand. See Cichocki v. Astrue, 534 F. App'x 71, 76 (2d Cir. 2013) (summary order) (finding that where the ALJ "thoroughly explained" his credibility finding and the record enabled the court to deduce his reasoning, remand was not necessary despite failure to follow two-step process (quoting Mogeur v. Heckler, 722 F.2d 1033, 1040 (2d Cir. 1983))). But in this case, the ALJ failed to discuss her

credibility determination in such a way that would enable this court to "glean the rationale" of her decision with respect to both medical and other evidence in the record.

*    *    *    *

If an ALJ applies the incorrect legal standard, the court can remand the case for further development of the evidence. Rosa v. Callahan, 168 F.3d 72, 82-83 (2d Cir. 1999) (quoting Pratts v. Chater, 94 F.3d 34, 38-39 (2d Cir. 1996)). But if application of the correct legal standard "could lead to only one conclusion, there is no need to require agency consideration." Johnson, 817 F.3d at 986; see Havas v. Bowen, 804 F.2d 783, 785 (2d Cir. 1986)). Still, even where there might be substantial evidence in support of the SSA's decision, where there is "a reasonable basis for doubt whether the ALJ applied the correct legal principles," upholding a finding that Plaintiff is not disabled "creates an unacceptable risk that a claimant will be deprived of the right to have [his] disability determination made according to the correct legal principles." Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987).

Here, the ALJ appears to have committed legal error by failing to comply with the SSA regulations that govern the assessment of a claimant's credibility. First, the ALJ failed to make her credibility finding prior to determining Plaintiff's RFC. Second, she amplified this error by failing to explicitly weigh Plaintiff's subjective account against both the medical and other evidence in the record. Instead, her written decision reflects that the ALJ considered only her formulation of Plaintiff's RFC, along with the fact that Plaintiff continued to attend school and collect unemployment, to determine that Plaintiff was not credible. In the absence of any further discussion of the record specifically with respect to Plaintiff's credibility, this court cannot find that—regardless of these errors—application of the correct standard would lead to only one possible conclusion. Thus, the ALJ's failure to comply with SSA regulations and fully articulate

the rationale underlying her credibility determination constitutes legal error that necessitates remand.

On remand, the ALJ must conduct the appropriate two-step analysis for determining Plaintiff's credibility as set forth in 20 C.F.R. § 416.929(b). The ALJ is further instructed to provide a more explicit analysis of Plaintiff's subjective complaints. This re-evaluation of Plaintiff's credibility should be based upon all of the record evidence. If the ALJ continues to find Plaintiff's claims to be incredible, she must cite to specific record evidence that contradicts Plaintiff's claims about the nature and severity of his conditions.

## V.    CONCLUSION

For the reasons set forth above, the court concludes that none of the evidence Plaintiff has presented constitutes new and material evidence justifying remand. However, the court further concludes that the ALJ committed legal error when she first assessed Plaintiff's RFC before comparing it to Plaintiff's subjective testimony. Moreover, the ALJ compounded this error by failing to articulate with specificity the weight she assigned to the evidence in evaluating Plaintiff's credibility. These errors warrant remand.

Accordingly, the Commissioner's motion for judgment on the pleadings is DENIED, Plaintiff's cross-motion for judgment on the pleadings is GRANTED IN PART, and the case is REMANDED to the SSA for re-evaluation of Plaintiff's credibility in accordance with SSA regulations and in light of the entire record.

SO ORDERED.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York          NICHOLAS G. GARAUFIS
       August  7 , 2015                United States District Judge